Filed 3/18/14  P. v. Gutierrez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B241823 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA118815) |
| v. | |
| RICO R. GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Raul Anthony Sahagun, Judge.  Reversed in part, affirmed in part as modified, and remanded with directions.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found defendant Rico Roque Gutierrez guilty of four counts of lewd and lascivious acts on a child (Pen. Code, § 288, subd. (a))[1] (counts 1, 4, 5 & 6) and two counts of oral copulation with a child under 14 (§ 288a, subd. (c)(1)) (counts 2 & 3). The jury found true in counts 2 and 3 the allegation that the victim was under the age of 14 years and the defendant had substantial sexual conduct with the victim pursuant to section 1203.066, subdivision (a)(8).[2]

The trial court denied probation and sentenced defendant to state prison for five years. The sentence consisted of the low term of three years in count 2 and two consecutive years in count 3 (one-third the midterm of six years). The court imposed concurrent low terms of three years on the remaining counts.

Defendant appeals on the grounds that: (1) he was denied his Sixth Amendment right to effective counsel because trial counsel should have objected to the admission of the victim's hearsay statements through the testimony of two sheriff's deputies who interviewed her, and reversal is required; (2) he was denied his Sixth Amendment right to effective counsel when trial counsel did not object to numerous instances of prosecutorial misconduct that denied defendant due process and a fair trial requiring reversal; and (3) the probation ineligibility allegation must be stricken and the matter remanded for resentencing, since the allegation does not apply to counts 2 and 3.

**FACTS**

**Prosecution Evidence**

Madalyn C. was 13 years old in December 2010, and she would turn 14 on January 16, 2011. In late November 2010, Madalyn began taking boxing lessons at a gym in Whittier to train for her first fight on January 9, 2011. She and a girlfriend, Bobbie U, sparred together at the gym. Madalyn trained with defendant every day that he

---

[1]    All statutory references are to the Penal Code unless otherwise indicated.

[2]    Defendant was convicted after his second trial. The first jury deadlocked, and the trial court declared a mistrial.

2

was at the gym. At one point, defendant asked Madalyn how old she was, and she told him she was 13.

Madalyn testified that she had a "small crush" on defendant and obtained his telephone number from Bobbie. Madalyn texted defendant, and he responded. He telephoned her later the same night. They at first talked about sparring and Christmas. At one point, defendant asked her if she wanted to get him something for Christmas. Madalyn said she did not know and then defendant asked if she wanted to have sex. Madalyn had not had sex up to that time. In phone conversations defendant said other sexual things, such as asking her if she wanted to give him a blow job and if she wanted him to finger her.

Defendant asked Madalyn if she would like to go jogging with him so they could have "alone time." In December 2010 and January 2011, defendant took Madalyn jogging at Pioneer High School. During a jog before the Christmas holidays in December, defendant took Madalyn to a tunnel under the bleachers where they hugged and kissed. That was the first incident she remembered.

The second incident occurred a week later, also before Christmas. They went into the tunnel at Pioneer High School and defendant asked her if she wanted to give him a blow job. Defendant sat Madalyn down on some stairs and took out his penis. He told her to "put [her] mouth on it," and she complied. When she stopped, he said, "Keep going." He told her to stop when he said he saw someone or something.

In December 2010, Madalyn sent Bobbie a text message saying that, "I gave Rico head." Bobbie recalled a text massage saying "that she had blown him." Bobbie stayed overnight at Madalyn's home on Christmas Eve that year. According to Madalyn, defendant texted her that night and asked her if she wanted to go over to his house. He offered to pick her up. He wanted to know if she wanted to have sex with him, and she said, "No."

A week after the second incident, Madalyn and defendant went jogging and hugged and kissed again. When she expressed a reluctance to leave, defendant asked her

3

if she wanted to give him head. She said she did not know. He kept asking, so she eventually gave in. This time defendant ejaculated in her mouth.

That same week, defendant tried to take Madalyn under the bleachers again. Madalyn thought that was when he asked to finger her and she refused.

The next incident occurred shortly after the January 9 fight. Defendant took her to the stairs in the bleachers and sat her on his lap. He put his hand under her shorts but on top of her leggings. Madalyn did not let him touch her vagina and defendant asked, "Why do you keep saying no to everything?"

Before her 14th birthday they went jogging again and hugged and kissed. Defendant touched her buttocks under her leggings and she pulled away because she had her period. Defendant said, "You don't bleed back there."

Madalyn did not fight on January 9. The gym owner put Bobbie, who was 16, in the fight because she was closer in age to the opponent. Madalyn was "kind of" disappointed.

During this time period, Madalyn's grades went down a lot and she stopped going to the gym because she did not want to see or deal with defendant. She stopped going to the gym at the end of January or the beginning of February. She and defendant did not have a fight, and they were on good terms.

According to Madalyn's father, during the months of December 2010 and January 2011, Madalyn became secluded. She stayed in her room more, her grades dropped, and she stopped talking to her father even though they were close. She began slicing herself on her thigh with a needle. Madalyn's father decided to confront her and began by talking about her grades. When he said, "I know it's a boy," Madalyn began to cry. Madalyn's father asked her if she would rather tell his girlfriend, Tracy R., whom Madalyn thought of as her stepmother, and Madalyn called Tracy.

On February 21, 2011, Madalyn's father went with her to report the incidents to the police. Los Angeles Deputy Sheriff Michelle Valdez interviewed Madalyn at the sheriff's station. Madalyn said that two of the incidents occurred before her 14th birthday, but a third incident occurred on January 19, and a fourth on January 26.

4

Madalyn related five incidents of molestation to Deputy Valdez. Madalyn described the first incident as hugging and kissing. The second and third incidents consisted of Madalyn orally copulating defendant. The fourth incident occurred when they hugged and kissed and defendant put his hand between her shorts and her leggings. The fifth incident occurred when defendant put his hand on Madalyn's buttocks inside her clothing.

Madalyn testified that she did not remember the dates exactly when she spoke with Deputy Valdez and "wanted to get out of there." She was much more comfortable when she spoke later with Detective Paul Valle. Deputy Valdez was more intense.

Madalyn related six incidents of molestation to Detective Valle on February 23, 2011. She described the same incidents that she described to Deputy Valdez, but added an incident of hugging and kissing during their jog, which occurred in between the oral copulations and the incident where defendant put his hand between Madalyn's shorts and her leggings. She told Detective Valle that all of the incidents occurred before her 14th birthday on January 16, 2011.

At the direction of Detective Valle, Madalyn made two pretext calls to defendant. In the first call, Madalyn told defendant that her father had read a couple of text messages and suspected that "something was going on between [them]." Defendant asked Madalyn if he should be scared, and she replied, "A little bit." Defendant said, "But we didn't do anything though. Okay?" When Madalyn said her father really wanted to know what they did, defendant said, "Nothing. Tell him the truth . . . tell him we didn't do anything. . . . Don't say anything, please, God, please don't say anything. Please don't. Okay?"

In the second call, Madalyn told defendant that her father "almost found out everything." Defendant asked, "But he didn't?" and Madalyn responded, "Not yet. He doesn't know about the—the BJ or nothing." Defendant replied, "Okay. Well, he can't prove it or anything." He told Madalyn that they didn't do anything and he wanted her to start thinking like that so that was what she believed and would be believable when she said it to her father. When Madalyn stated that she thought her father already knew about

5

"the BJ" defendant said, "I'm really scared right now. Like I threw up last night. I'm really scared. I don't want to get in trouble." He later repeated, "I'm like really scared; like you don't understand. Like I don't feel we did anything bad and it's not, I mean, it's not that really big of a deal and like there's nothing that your dad can prove as long as you deny everything we—everything that happened, you know, and then I just don't want you admitting anything to your dad. I want you just to say nothing happened and, you know, nothing happened. It would be, you know, nothing happened. I really want you to do that for me. Please, Mady, you don't understand like I don't want to get in any trouble. Defendant stated that he was scared and could not sleep the night before. Defendant repeated that Madalyn must "deny everything." Madalyn told defendant that if her dad found out about everything, he would probably want to kill defendant. Defendant replied, "Oh, my God, I'm so worried. I just don't want him to overreact. I want him to believe you. I want you to—I want him to just believe you when you say that you didn't do anything; you know?"

**Defense Evidence**

Defendant testified that from July 2008 through February 2011, he was a full-time physical education teacher at a middle school. There had never been a complaint made about his conduct with the students.

Defendant said he met Madalyn through the Valdez Muay Thai gym. He did not officially work there but he assisted in training both boy and girl fighters. He went on runs with the students to Pioneer High School where there were always people around. He went on runs with Madalyn on a few occasions, but primarily he worked with her in the ring. There was never a time during any of the runs with Madalyn that he had any type of physical contact with her in a sexual way. He never hugged or kissed her, although Madalyn attempted to kiss him on one occasion.

After Madalyn first contacted him by text message, they had text conversations back and forth, sometimes on a daily basis. They spoke on the phone three to four times a week. Madalyn told him he was cute. The majority of the text messages were just friendly but some were sexual. In hindsight, he believed the texting was inappropriate.

6

He was flattered but not turned on. He had no intention of following through with anything sexual. He had deleted the text messages because they were inappropriate.

With regard to the pretext calls, defendant testified that everything he said, such as his statements about being "worried," "sick," or that Madalyn's father "can't prove anything" were related to the sexual text messages, not any sex acts between defendant and Madalyn.

Several character witnesses, including defendant's girlfriend, testified that defendant acted appropriately with children, and he was an honest and truthful person. George Valdez, the gym owner, testified that defendant sometimes gave more attention to Madalyn, but that was because she was one of those who wanted to compete and needed more time. Valdez did not notice anything unusual between them. It was strictly training. Valdez testified that the gym was not open between Christmas and the New Year's holiday. He believed defendant worked at the gym leading up to Christmastime. He then testified that it was possible defendant worked between Christmas and the New Year.[3]

Dr. Veronica Thomas performed a psychosexual analysis of defendant. According to Dr. Thomas, defendant did not fit the profile of a sexual predator, and he had no sexual deviant behaviors or interests. Defendant displayed a normal heterosexual pattern, which included an objective sexual interest in adolescent and adult females. Dr. Thomas explained that it is biologically determined that males are sexually attracted to females who are likely to produce children, and adolescent females fit into that category.

## DISCUSSION

### I. Failure to Object to Deputies' Testimony

#### A. *Defendant's Argument*

Defendant contends that trial counsel failed to object to the admission of Madalyn's hearsay statements through the testimony of Deputy Valdez and Detective

---

[3]     Defendant had testified that he was out of town for Christmas Eve and then for the rest of December. He stated that he spent from December 26 through January 30 in Redlands because his grandfather died on December 26, 2010.

7

Valle.  Their testimony was consistent with Madalyn's trial testimony, but no foundation was laid to admit Madalyn's statements to the deputies as prior consistent statements in accordance with Evidence Code sections 1236 and 791.

### B.  Relevant Authority

Evidence Code section 1236 provides:  "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

Evidence Code section 791 provides:  "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:  [¶]  (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or  [¶]  (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Absent an express or implied charge that a witness's trial testimony is recently fabricated or influenced by bias or improper motive, evidence of a prior consistent statement is not admissible.  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219, fn. 6; *People v. Frye* (1985) 166 Cal.App.3d 941, 950.)  "[A] prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony."  (*People v. Hayes* (1990) 52 Cal.3d 577, 609.)

A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, that counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, defendant would have obtained a more favorable result.  (*In re Jones* (1996) 13 Cal.4th 552, 561.)  In order to prevail on an ineffective assistance of counsel claim on appeal, the record must affirmatively disclose the lack of a rational

8

tactical purpose for the challenged act or omission. (*People v. Majors* (1998) 18 Cal.4th 385, 403.) Defendant must overcome presumptions that counsel was effective and that the challenged action might be considered sound trial strategy. (*In re Jones*, *supra*, 13 Cal.4th at p. 561.) We consider counsel's overall performance throughout the case, evaluating it from counsel's perspective at the time of the challenged act or omission and in light of all the circumstances. (*People v. Bolin* (1998) 18 Cal.4th 297, 335.) "To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' [Citation.]" (*Id.* at p. 333.)

### C. No Ineffective Assistance

The gist of defendant's ineffective assistance claim is that Madalyn's statements to Deputy Valdez and Detective Valle did not qualify as prior consistent statements under the statute, and, therefore, counsel should have raised an objection to them. For example, he asserts that her statements to the deputies were not made before the motive to fabricate was alleged to have arisen, since her motive to fabricate already existed at the time of her interviews. Therefore, these statements did not meet the temporal requirement of Evidence Code section 791, subdivision (b). (See *People v. Bolin*, *supra*, 18 Cal.4th at pp. 320-321.) Defendant also contends "there is no conceivable, reasonable tactical basis for not objecting to the admission of Madalyn's prior consistent statements."

Respondent argues that the evidence was admissible under the "negative evidence" exception. Respondent notes that prior consistent statements may be admitted under Evidence Code section 791, subdivision (b) when there is a charge that the witness's testimony at the hearing is recently fabricated, and recent fabrication "'may be inferred when it is shown that a witness did not speak about an important matter at a time when it would have been natural for him to do so.'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 803.) This situation is an exception to Evidence Code section 791's requirement that the consistent statement be made before an improper motive is alleged

to have arisen. (*People v. Gentry* (1969) 270 Cal.App.2d 462, 473; see also *People v. Williams* (2002) 102 Cal.App.4th 995, 1011-1012.)

Defendant counters that the prosecutor did not offer the evidence for this purpose and did not obtain a ruling from the trial court that the evidence would be admissible for this purpose. Therefore, the prosecution forfeited this issue and this court should not consider respondent's argument made for the first time on appeal. Furthermore, defendant argues, he is not alleging that Madalyn was impeachable by her prior silence. The negative evidence exception does not apply in this case because the claim of fabrication made here was not based on a claim that Madalyn did not speak of the matter before, when it would have been natural to speak. It was shown that Madalyn did speak—to her father, to Deputy Valdez, and to Detective Valle.

We note that defense counsel did challenge Madalyn on her silence during the time defendant was alleged to have been committing the charged acts. When questioning Madalyn about her argument with her father, counsel elicited that the argument was not about Rico or text messages, but that eventually her father brought up the messages. He then asked: "And you still at the point you don't tell him that there's some kind of physical relationship with Rico; right?" Defense counsel also noted that Madalyn would get a ride home from the gym with her grandparents or parents and asked: "And you never mentioned a thing to them about any kind of physical relationship with Rico; is that right?" Counsel confirmed Madalyn's routine with the running and gym training and asked: "During that entire time in December and January you never indicated to your parents or your grandparents that you were uncomfortable about going to the gym or getting there early to go on a run or anything about that; is that correct?" The objection to these questions as "asked and answered" was sustained.

Given these challenges, Madalyn's statements to the deputies were admissible under the "negative evidence" exception to Evidence Code section 791, subdivision (b). The defense questions implied that Madalyn fabricated her accusations because she "'did not speak about an important matter at a time when it would have been natural for [her] to do so.'" (*People v. Riccardi*, *supra*, 54 Cal.4th at p. 893.) As noted, this exception

10

overrides Evidence Code section 791's requirement that the consistent statement be made *before* an improper motive is alleged to have arisen. (*People v. Gentry*, *supra*, 270 Cal.App.2d at p. 473; *People v. Williams*, *supra*, 102 Cal.App.4th at pp. 1011-1012.)

Defendant cites *People v. Armstead* (2002) 102 Cal.App.4th 784 (*Armstead*) for the proposition that the People cannot change the scope or basis of admissibility of the evidence for the first time on appeal. (*Id*. at p. 787.) In *Armstead*, the issue was instructional error in a case where the defendant was charged with several separate robberies. (*Id*. at pp. 787-790.) In response to a query from the jury, the court issued a clarifying instruction that "'appear[ed] to have had the effect of admitting the evidence of the other charged crimes as evidence of identity, motive and intent as to all other charged crimes,'" as permitted by Evidence Code section 1101, subdivision (b). (*Armstead*, at p. 792; see *People v. Ewoldt* (1994) 7 Cal.4th 380, 393-407.) The reviewing court was concerned with "'whether a court can, consistent with due process, change the basis of admissibility of evidence after the close of evidence and indeed after closing argument and the commencement of jury deliberations.'" (*Armstead*, at p. 792.) The court concluded that the trial court's implied change to the basis of admissibility of evidence at such a late point in the case did not comport with due process and effectively denied Armstead his right to counsel. (*Id*. at p. 792.)

The situation in *Armstead* is not analogous to that of the instant case. *Armstead* was concerned with admitting certain evidence that applied to one charge as evidence tending to prove one or more other charges (as other crimes evidence) and advising the jury members that they could consider the evidence this way during deliberations. In the instant case, assuming the trial court admitted the prior consistent statements for an incorrect reason, as long as there exists a legitimate reason for admitting these statements, a reviewing court may affirm the ruling. (*People v. Smithey* (1999) 20 Cal.4th 936, 972.) "'"'[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" [Citations.]'" (*Ibid*.) In *Smithey* itself, a ruling

11

allowing certain statements into evidence was affirmed despite being admitted on an incorrect theory. (*Id.* at pp. 971-972; see also *People v. Zapien* (1993) 4 Cal.4th 929, 976.) Accordingly, there was a legitimate basis for admission of Madalyn's statements to the two deputies. Therefore, the trial court's ruling was correct. As a result, defense counsel cannot be faulted for failing to object.

Furthermore, we disagree with defendant that "there is no conceivable, reasonable tactical basis for not objecting to the admission of Madalyn's prior consistent statements." The record indicates that defense counsel wished to employ the testimony of Deputy Valdez and Detective Valle to discredit Madalyn. As defendant notes, Deputy Valdez did not testify at defendant's first trial, but Detective Valle did. At the second trial, defense counsel told the court that he had intended to use Deputy Valdez's interview, where two of the incidents appeared to have occurred after Madalyn's 14th birthday, to attack Madalyn's statement to Detective Valle, where Madalyn stated that all the incidents occurred before her 14th birthday. In the context of protesting the prosecution's attempt to add two more counts to the information, defense counsel stated, "I could have saved us a lot of time by not going over all the discrepancy and the dates and time, all of that nature. It was part of my defense at the last trial they were aware of it." That defense counsel intended to use Madalyn's statements to the deputies as a means of challenging her credibility was borne out by defense counsel's argument at the close of trial.

Although Deputy Valdez did not testify at defendant's first trial, defense counsel questioned Madalyn extensively about her interview with the deputy on cross-examination at that trial. Counsel asked Madalyn about the dates and times of the incidents that she related to Deputy Valdez, including a fourth and fifth incident that occurred allegedly on January 19, 2011 and January 26, 2011, respectively (after Madalyn's 14th birthday).

Defendant downplays Detective Valle's testimony in the first trial by asserting that it was restricted to the text messages between Madalyn and defendant. The record of the first trial shows that on direct examination this was largely correct. On cross-

12

examination, however, defense counsel questioned Detective Valle about Deputy Valdez. Counsel reviewed Deputy Valdez's report with Detective Valle regarding the dates and times Madalyn gave the deputy as opposed to what she related to the detective. Counsel pointed out that one day after her interview with Deputy Valdez, Madalyn's memory had improved as to the dates of the sexual incidents.[4] Defense counsel also went over many of Madalyn's statements to Detective Valle—repeating the statement and asking the detective if that was what Madalyn had said. Defense counsel asked Detective Valle if it was not true that Madalyn had described six different incidents to him, but only five to Deputy Valdez. Given this extensive exposure of Madalyn's statements to the two deputies in the first trial, it is mere speculation to state that their testimony at the second trial was pivotal in the jury's reaching a guilty verdict.

Defendant also points to the fact that his attorney filed a motion in limine to exclude the statements of the alleged victim unless otherwise admissible under the Evidence Code, but then withdrew that portion of the motion. Counsel did withdraw the request to exclude any prior statements of witnesses under the prior consistent statement theory and the prior inconsistent statement theory unless the People demonstrated that the proposed statements satisfied the statutory requirements. Counsel stated during the Evidence Code section 402 hearing that this request was "just a statement of the law, so I'll withdraw that." We do not believe that this indicates that counsel "gave the matter some thought and concluded that an objection would be futile" because he did not consider it correctly.

Finally, we do not view as significant the sidebar discussion that leads defendant to assert that his attorney did not understand the prior consistent statement hearsay exception. The sidebar occurred during the prosecutor's direct examination of Detective Valle. The prosecutor asked Detective Valle about the first incident by repeating what Madalyn told the detective: "And she told you that Rico took her underneath the north

---

[4]     There was actually a lapse of two days between the interviews.

13

bleachers to a walkway tunnel on the west side of the bleachers?" Detective Valle replied, "Yes." The prosecutor next asked, "And she explained that the tunnel contained that staircase?" Defense counsel objected that the prosecutor was leading by reading from a report as opposed to asking what was said to the officer. At a sidebar, the trial court stated that "the reason these statements come in is because they're prior consistent statements." Defense counsel stated, "I was going to make it hearsay but I know that I figure." The prosecutor said, "I'm able to elicit a prior consistent statement. I said inconsistent." The court replied, "Right. But some things are significant. Other things are not significant."

It is not clear what anyone meant during that discussion, and it is rather a meager basis for finding ineffective assistance. It is obscure what defense counsel meant when he said "I know that I figure," and what the prosecutor meant by saying "consistent" and then "inconsistent." The trial court appeared to agree with the prosecutor that the statements were either consistent or inconsistent, but it is not clear which. The court then appeared to rest its ruling on the significance of the elicited statements. In any event, as we have stated, we believe defense counsel had a tactical purpose in questioning Deputy Valdez himself about the statements Madalyn made and then following up by questioning Detective Valle and contrasting Madalyn's assertions in the two interviews.

With respect to prejudice, defendant claims that, by not objecting, defense counsel allowed the prosecution to present its case-in-chief a second and third time without cross-examination. He argues that the testimony tended to reinforce in the jurors' minds the impression that Madalyn was truthful. Defendant points out that in his first trial, where the prosecution had admitted evidence of numerous sexually explicit text messages as exhibits, but no evidence of prior consistent statements, the jury was unable to reach a verdict on any count. According to defendant, this clearly demonstrates that the prior consistent statements were of significant evidentiary value to the jury.

As our prior discussion indicates, we do not find a significant difference in the information given to the jury in the two trials about Madalyn's statements to the two deputies. We believe counsel was not ineffective by employing the strategy he explained

14

and also that defendant was not unduly prejudiced by these tactics. In addition, we conclude that the statements were admissible under the "negative evidence" exception to the requirements of Evidence Code section 791.

There is one aspect of the evidence that is troubling, however. We note that the prosecutor failed to elicit with respect to count 4 that Madalyn and defendant engaged in "hugging and kissing," which is the lewd act she ascribed to count 4 in closing argument. Madalyn testified that hugging and kissing occurred in the first incident, and oral copulation in the second and third. Madalyn next stated that during the same week as the second oral copulation, defendant tried to take her under the bleachers again, and she thought this was when he asked to finger her. She refused. Madalyn did not say that she and defendant hugged and kissed, and the prosecutor moved on without eliciting any more testimony on the fourth incident. The only evidence that hugging and kissing occurred during this incident was contained in Detective Valle's testimony. Although we believe Madalyn's statements to Detective Valle were admissible in general, her statement regarding count 4 to the detective cannot be deemed consistent with her trial testimony and should not have been admitted. Therefore, we believe defendant's conviction in count 4 must be reversed for insufficient evidence.

## II. Failure to Object to Prosecutor's Argument

### A. Defendant's Argument

Defendant contends that his trial attorney was ineffective in failing to object when the prosecutor: (1) used defendant's exercise of a specific fundamental constitutional guarantee against him at trial; (2) vouched for Madalyn's credibility and attempted to inflame the jury's passions; and (3) misstated the law in a manner that improperly shifted the government's burden of proof to defendant. Defendant argues that, either individually or cumulatively, these instances of misconduct deprived him of due process and a reliable jury verdict, and reversal is required.

### B. Relevant Authority

"We review claims of prosecutorial misconduct pursuant to a settled standard. 'Under California law, a prosecutor commits reversible misconduct if he or she makes

15

use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'''"  [Citations.]  In addition, "'a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.  [Citation.]'" [Citation.]  Objection may be excused if it would have been futile or an admonition would not have cured the harm." (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

It is established, that "[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)  "Failure to object rarely constitutes constitutionally ineffective legal representation . . . ." (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)

### C.  No Misconduct

#### 1.  Reasons for Going to Trial

Shortly after beginning her closing argument, the prosecutor stated, "You know, sometimes a person goes to trial because they have the right that they want to vindicate a right and sometimes they want to roll the dice and see if they can hang you up.  And that's this case.  Well, look at their case, and I'm going to go over each witness one by one.  Believe me, I will."  The prosecutor went on to discuss defendant's character witnesses and expert witness.

In arguing that these words amounted to objectionable misconduct, defendant cites *Burns v. Gammon* (8th Cir. 2001) 260 F.3d 892, 896 (*Burns*), for the proposition that "The prosecution cannot use the defendant's exercise of specific fundamental

16

constitutional guarantees against him at trial." According to defendant, the prosecutor here improperly told the jury that defendant exercised his constitutional right to a jury trial, not because he was presumed innocent, but because he wanted to gamble that he could hang the jury.

In *Burns*, with respect to both guilt and sentencing, the prosecutor asked the jury to consider that the defendant, by exercising his right to a jury trial, had forced the victim to testify and relive the attack on her. (*Burns*, *supra*, 260 F.3d at p. 896.) The defendant's counsel did not make a sufficient constitutional objection to this argument, which was made in rebuttal just prior to jury deliberations. The court held that counsel's failure to object prejudiced Burns and infected his trial with constitutional error. (*Ibid.*; cf. *Darden v. Wainwright* (1986) 477 U.S. 168, 182 [prosecutorial misconduct during closing argument may infect trial with constitutional error when it "implicate[s] . . . specific rights of the accused"].)

Although we agree with the principle discussed in *Burns*, we conclude defendant's prosecutor was not guilty of misconduct and counsel was therefore not ineffective. The prosecutor's remarks in this case were not on a par with those of the *Burns* prosecutor. The remarks at issue here were made at the beginning of closing argument, just after the conclusion of the defense case. The comment was not an attempt to disparage defendant for exercising his right to a jury trial by playing on the jury members' sympathy for the victim, as occurred in *Burns*. Rather, the prosecutor made this comment after pointing out that the defendant appeared to be blaming the victim and saying that she "came on" to him. She pointed out that Madalyn was 13 and defendant was 28 years old with a college education and yet defendant wanted the jury to believe it was Madalyn who came up with all of the suggestions about fingering, blow jobs, and the other sexual things they discussed. Thus, the prosecutor was commenting on what she considered the preposterous nature of the defense. The prosecutor is afforded "wide latitude in describing the factual deficiencies of the defense case." (*People v. Cash* (2002) 28 Cal.4th 703, 733.) The prosecutor then went on to express the view that, although defendant's defense was preposterous, he nevertheless hoped the jury would believe him.

17

The prosecutor did not criticize defendant for exercising his right to a trial. Her comment was similar to the oft-heard allegation that the defense was throwing mud at a wall and hoping that something would stick. We find no misconduct.

### 2. *Vouching for Madalyn*

Defendant contends that the prosecutor improperly vouched for Madalyn's credibility and attempted to inflame the jury's passions when she said at the beginning of her argument that she found it "very offensive and I apologize for showing it because as I'm sitting there and as my blood is boiling as I'm listening to lie after lie after lie after lie, I think God why do I do this? And then I remember why I went into sex crimes. It was because in these cases there's an imbalance of power. In these cases you're dealing with someone who has more power, whether it be experience, age, sophistication, physical strength, you name it, and somebody who's weaker. And that's not an insult. Whether it's the woman who's being beaten up by her husband where she doesn't have a shred of self-esteem left or the small child that gets molested by her stepdad or it's the teacher slash instructor who takes advantage of a teenage 13-year-old virgin's crush on him, it is offensive. And we can't say that we're here and we want to protect women and we want to protect our children and turn around and judge them. You can't do that. Madalyn was 13. She behaved like a 13-year-old."

According to defendant, with these words, the prosecutor was clearly vouching for Madalyn's credibility. The prosecutor improperly referred to her experience with other sex cases and victims of sex crimes in general to suggest that women and children do not lie and jurors should not judge them. Also, the prosecutor attempted to inflame the passions of the jury by suggesting that she had been victimized by having to listen to the defense's lies, which caused her to ask God why she got into this in the first place.

The general rule is that improper vouching for the strength of the prosecution's case "'involves an attempt to bolster a witness by reference to facts *outside* the record.'" (*People v. Williams* (1997) 16 Cal.4th 153, 257.) Thus, it is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or

18

depth of experience, or the prestige or reputation of their office, in support of it.  (See, e.g., *People v. Medina* (1995) 11 Cal.4th 694, 758.)

Considering the gist of the defense in this case, we would not characterize these comments as vouching for Madalyn's credibility.  As noted *ante*, defendant clearly wished to portray himself as being drawn into the sexual aspect of his relationship with Madalyn (which he claimed consisted solely of text messages) by *her* suggestions. Defendant testified that he had never hugged or kissed Madalyn, but she had attempted to hug and kiss him on one occasion.  Although he had never given Madalyn his telephone number, she had obtained it and texted him, to his surprise.  Madalyn had told him he was cute and that she liked him.  The prosecutor brought out that defendant previously testified that Madalyn initiated a conversation in which she said it would be nice for him to "finger[ ] her."  When asked if he sent Madalyn messages with a sexually explicit content, defendant replied, "In reply to her text messages, yes."  The prosecutor brought out that defendant had previously testified similarly, stating that "I was replying to her initiation of certain topics."  He admitted only that he responded "inappropriate[ly]" to things that *Madalyn* wanted to do.  When asked again if he engaged Madalyn in sexual communication, defendant answered, "I replied to her text messages."  He insisted that he "didn't initiate."  When defendant denied that he was turned on by the text messages and was asked why he did not talk about other subjects, defendant replied, "Because she initiated all those text message conversations."  Given defendant's testimony in this vein, the prosecutor clearly wished to establish in the beginning that defendant's version was untruthful.  These comments thus address defendant's lack of credibility rather than bolster Madalyn's credibility.

In context, the prosecution's comment that "we" cannot judge refers to society and/or the legal system rather than the jury members specifically.  It appears that the prosecutor was pointing out that society and the legal system are supposed to protect women and children, and it would be wrong to find that an adult who took advantage sexually of a precocious 13-year-old was without fault because of the 13-year-old's apparent consent to engaging in the sexual behavior.  This comment was once again a

19

response to the defense tactic of characterizing Madalyn as the initiator of all sexual suggestions. It is not misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. (*People v. Huggins* (2006) 38 Cal.4th 175, 207.)

As for inflaming the jury's passions, although the prosecutor may have become somewhat dramatic in her monologue, it does not appear that she actually asked God the rhetorical question regarding why she prosecuted sex crimes. She used the word "god" as a mild, "profane" interjection as people commonly do. Even though the prosecutor referred to her reasons for choosing her area of law, it was a mere passing reference. We are not persuaded that the jury drew the damaging inference suggested by defendant. Even if some aspects of this argument were inappropriate, they were of no real importance in the context of the entire argument.

### 3. Shifting of Burden of Proof

Defendant contends the prosecutor committed misconduct when, after discussing the reasonable doubt standard, she argued: "In this case there has not been any reasonable arguments by the defense as to why this defendant is not guilty. He is guilty of lewd act on a child under the age of 14 and receiving oral copulation from a child under the age of 14. Thank you."

Again, we disagree that these remarks constituted prosecutorial misconduct. The prosecutor was not attempting to shift the burden of proof to defendant. This remark occurred in the prosecutor's rebuttal argument, after defense counsel had argued his case. The prosecutor was clearly referring to the defense *argument* and not the burden of proof. The prosecutor discussed the difference between what was merely a possible explanation for a fact and what was a reasonable one. The prosecutor was reminding the jury that the verdict must be reasonable. The argument "did little more than urge the jury not to be influenced by [defense] counsel's arguments, and to instead focus on the testimony and evidence in the case." (*People v. Stanley* (2006) 39 Cal.4th 913, 952.)

Having found no prosecutorial misconduct, we conclude there was no ineffective assistance of counsel for failing to object to the remarks of which defendant complains. "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the

20

defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) If any comments bordered on misconduct, the effect was de minimis and harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Moreover, any possible prejudice resulting from any of these remarks was mitigated by the trial court's instruction to the jury that the attorneys' statements during the trial were not evidence (CALCRIM No. 222), and that the jurors were not to let sympathy or prejudice influence their decision (CALCRIM No. 200).

Since we have found no pattern of prosecutorial misconduct, we conclude that no cumulative reversible and prejudicial error resulted from the prosecutor's argument. Given that defendant's arguments lack merit, he was not denied the effective assistance of counsel.

## III. Probation Eligibility

### A. Defendant's Argument

Defendant contends that the allegation under section 1203.066, subdivision (a)(8), which states that defendant is statutorily ineligible for probation in counts 2 and 3, must be stricken, and the matter must be remanded for resentencing. He asserts that section 1203.066, subdivision (a)(8) does not apply to a violation of section 288a as charged in these counts. Respondent concedes that section 1203.066, subdivision (a)(8) does not apply to the convictions in counts 2 and 3 but contends that remand for resentencing is not necessary.

### B. Relevant Authority

Section 1203.066 provides: (a) "Notwithstanding Section 1203 or any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this

21

section be stricken pursuant to Section 1385 for, any of the following persons: [¶] . . . [¶] (8) A person who, in violating Section 288 or 288.5, has substantial sexual conduct with a victim who is under 14 years of age."

### C. Allegation Incorrectly Applied

In counts 2 and 3, defendant was convicted of the crime of oral copulation of a person under 14 in violation of section 288a, subdivision (c)(1). Each count carried the allegation that the victim was under the age of 14 and the defendant had substantial sexual conduct with the victim pursuant to section 1203.066, subdivision (a)(8). The jury found true the allegations.

Defendant is correct that section 1203.066, subdivision (a)(8) does not apply to a violation of section 288a. Therefore, the allegation of probation ineligibility must be stricken. We decline respondent's suggestion that we extrapolate from the trial court's imposition of consecutive terms the conclusion that the court would not have granted probation in any event. Although the trial court granted more than the minimum sentence it could lawfully impose, we remand so that the trial court may once again exercise its discretion.

### DISPOSITION

The conviction in count 4 is reversed. The judgment is modified to strike the probation ineligibility findings in counts 2 and 3. In all other respects, the judgment is affirmed. The matter is remanded to the trial court for resentencing.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                                    BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

22